MOORE et al. v. PETTY et al.

(Circuit Court of Appeals, Eighth Circuit. January 18, 1905.)

No. 2,031.

**1. EXECUTORS—ACTIONS IN FOREIGN COURT—AUTHORITY TO MAINTAIN.**

An executor or administrator, in his representative capacity, cannot maintain an action in the courts of any sovereignty other than that under whose laws he was appointed and qualified, without obtaining an ancillary grant of letters in the state where the action is brought, unless the right so to do is conferred upon him by the law of the forum.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 2330–2333.]

**2. SAME.**

But whenever the cause of action declared upon by the foreign executor or administrator is one which involves an assertion of his own right, rather than one of the deceased, or which has accrued directly to him through his contract or transaction, and was not originally an asset of the estate in his charge, he may maintain an action in another state for the enforcement thereof, although express authority so to do may not be found in a statute of the forum.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 2330–2333.]

**3. SAME—ACCRUAL OF ACTION.**

A cause of action to recover from agents employed by executors the proceeds of a sale of real estate belonging to the decedent's estate accrues directly to the executors, and they may sue thereon in a state other than that of their appointment, without procuring new letters in that state.

**4. PLEADINGS—AMENDMENT—DISCRETION OF COURT.**

It was within the discretion of the trial court to allow the amendment at the trial of a petition alleging that a sale made by defendants as plaintiff's agents was in fact a sham concocted for the purpose of deceiving plaintiffs, and that, after accomplishing the same, defendants sold the land to others at a substantial advance, so as to allege that defendants, as agents, sold the land for the increased price, and received and retained such price.

**5. PRINCIPAL AND AGENT—MISCONDUCT OF AGENT—ACTION IN SELF-INTEREST —REMEDIES OF PRINCIPAL.**

Where agents, during the continuance of their agency, purchased for themselves land of their principals, using the name of another to give color to the transaction, and resold the same at a higher price, the benefit of the resale inured to the principals, and they could sue at law for the profit received and retained by the agents.

**6. TRIAL—VERDICT—DIRECTION—FORMALITY.**

Where the court directs a verdict, the usual and better practice is for the jury to return a formal verdict in writing, but the absence of such a verdict is not fatal to the validity of the judgment.

**7. PRINCIPAL AND AGENT—SALES BY AGENT—RIGHTS OF PRINCIPAL.**

Defendants were plaintiffs' agents for the sale of land, and expressly agreed that, for the compensation which they were to receive, they would look after plaintiffs' interests until the sale was concluded and

the money fully paid. They entered into a contract of sale which unauthorizedly bound plaintiffs to execute a warranty deed, and the purchaser, in the contract, did not so obligate himself that plaintiffs could have held him to the purchase. Before the question of the character of the deed was settled, and before the purchaser signed any obligatory writing, the latter transferred his interest in the property to defendants, without having made any payment. This fact defendants concealed from plaintiffs, and immediately thereafter sold the property themselves at a greater price than the first purchaser was to pay. In subsequent negotiations with plaintiffs, they still spoke of the first purchaser as making the purchase. *Held*, that the sale finally made by defendants was made by them as plaintiffs' agents, and plaintiffs were entitled to the profits thereof.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

This was an action brought by Robert B. Petty and Henry H. Negley, executors of the last will of Catharine R. Negley, deceased, against Charles E. Moore and William B. Chick, copartners as Moore & Chick, to recover certain moneys in the hands of defendants, received from the sale of a tract of land. The executors claimed that the land, when sold, belonged to the estate in their charge, and that the sale was made by defendants while acting as their agents. The defendants claimed that, while they once sold the land as agents of the executors, they duly accounted for the proceeds; that they thereafter bought the same from the purchaser, and resold it at a profit; and that the profit sought by the executors was their own. The petition, as first filed, proceeded upon the theory that the first sale by the defendants was a sham, and was really to themselves, though made colorably to another for the purpose of deceiving the executors and defrauding the estate; that, after accomplishing the deception, they sold the land to other parties at a substantial advance; and that consequently the estate was damaged in that amount. After the issues were joined, and when the cause came on for trial, the executors, with permission of the court, but against the objection of the defendants, amended their petition by alleging that the defendants, while acting as their agents, sold the land for the increased price, and received and still retained the same. No continuance or delay was requested by the defendants on account of the amendment. The cause was tried to a jury.

The record discloses the following facts:

Catharine R. Negley was a resident of Pittsburgh, Pa. Her will was duly probated in the orphans' court of Allegheny county, in that state. The plaintiffs, having been nominated therein as executors, qualified as such; and, in due course, letters testamentary were issued to them. The executors were invested by the will with full power to sell and convey the real property of the testatrix at public or private sale, and at such times and upon such terms as they might deem best, and to invest the proceeds. Included in the estate, which was considerable, was a tract of land in Cherokee county, Iowa. The defendants lived at Cherokee, Iowa; the executors, in Pennsylvania.

For several years prior to the transactions which resulted in the controversy the defendants had acted as agents of the executors in renting the Iowa land and paying the taxes. In August, 1901, the defendants wrote the executors that conditions were very unfavorable for the renting of the land in the future, and suggested the fixing of a selling price if the latter desired to sell. Then followed a course of correspondence covering a period of several months. The executors being willing to sell at a satisfactory figure, it was agreed that, if a sale was effected through defendants' efforts, they should, as agents, receive a commission of 2 per cent. of the selling price; the same "to include all ordinary transactions in relation to the future care of the matter such as collecting and forwarding the money." In this same connection the defendants had previously written the executors: "We would feel it incumbent upon us, if desirable to you, to still have charge of your interests in the premises until such time as the payments were all made."

The defendants wrote on November 14, 1901, that they had a customer who would pay $17,000 for the property. The executors did not accept the proposition, but suggested the propriety of advertising in a local paper that the land was for sale. The defendants answered that the suggestion might be good if it was proposed to divide the land and peddle it in parcels, but they questioned the advisability of doing that. The executors rejected the offer of $17,000, and named a higher figure, which they said they ought to obtain. To this the defendants replied that their customer, "after a careful examination of the land," declined to raise his first offer, and that they concurred in his views. They offered arguments in favor of their position, and said that the price desired by the executors was "out of the question" and "beyond the limit." It is worthy of note at this point that the customer who was said to have carefully examined the land is the man to whom the defendants claim to have made the sale two weeks later. He testified at the trial that he had never seen the land before purchasing, but had relied on defendants' statements concerning it. On December 12, 1901, the executors wrote that another party had written them, inquiring the price of the land. To this the defendants replied that they probably knew him, and that he was the man who in the preceding fall had offered them several thousand dollars less than the executors wanted. On December 16th the executors wrote that they had a definite offer from the other party; that they fixed the selling price at $18,081, the purchaser to pay a certain tax; that they regretted that defendants did not advertise the property for sale, for, had they done so, a still better price could probably have been secured; that they had expected that the defendants would use all proper means to obtain the highest possible price, and at least obtain bids from the other parties whom defendants said they knew. They also said that, if they did not hear from defendants by wire on the 19th of December, the price mentioned would be withdrawn. On the 18th the defendants wired and wrote that they had sold the land at the price mentioned. At no time prior to the 21st of December did the defendants advise the executors of the name of the person with whom they were negotiating, and to whom they claimed to have sold. The tenor of their letters is marked by unfavorable comments on the value of the land. They knew or believed that a party residing in the same town, who had once offered them $15,000 for the land, was then endeavoring to purchase from the executors, but they refrained from communicating with him. On the 18th of December a written contract of sale and purchase was prepared and signed by the defendants, as the agents of the executors, and by one Gray, as purchaser. The contract contained a requirement that the executors give the purchaser a good and sufficient warranty deed, except as to the tax already mentioned; that Gray pay $100 upon the execution of the contract, the receipt of which was acknowledged; that $2,900 be paid March 1, 1902; and that the remaining $15,081 be represented by notes and mortgage. The contract and a draft for the $100 were sent to the executors about a week afterwards. They returned the draft, and made various objections to the terms of the contract, among which was one to the requirement of a warranty deed. The sole evidence of the authority of defendants was in the correspondence, and it contained no warrant for a sale with covenants of warranty. The executors prepared and sent to the defendants a contract to be executed, but it was never executed by Gray, nor did he at any time bind himself in any enforceable way to accept such a conveyance as they were willing to give. The provisions of an Iowa statute affecting the sale of real property under foreign wills postponed the consummation of the transaction to about March 1, 1902. On February 21st, Gray executed two notes aggregating $15,000, and a mortgage to secure the same. On the 26th the defendants wrote the executors, inclosing a draft for the cash payment, less their commission, also the notes, and the mortgage, which had been recorded, and said that they "had Mr. Gray pay an amount to make the mortgage an even $15,000." They were retained by the executors.

On April 22, 1902, the defendants sent the executors a prepared deed "to be executed to Mr. R. H. Gray, the purchaser of this land"; and on the 26th of the same month the executors, having stricken out the clause of warranty, executed the same, and returned it to the defendants. In June, 1902,

the executors discovered that Gray had previously conveyed the land to the defendants, and that the latter had resold the same at an advance of more than $5,000. The $100 sent to the executors in December, 1901, by the defendants, and represented as being earnest money received from Gray to confirm the sale, was in fact furnished by the defendants themselves. Gray was a banker who lived at another town in Cherokee county, Iowa. He carried a balance in a bank in the town in which the defendants lived, and which was but a short distance from their office, where the contract of sale was said to have been prepared and signed. He did not draw a check upon his balance in that bank for the earnest money, but, on the contrary, the defendants, who had had previous dealings with him, advanced the money themselves, and charged Gray with the same upon their books. After the draft for the earnest money was returned by the executors, the defendants credited Gray therewith. When the cash payment of $3,081, less commission, was remitted to the executors, on February 26, 1902, Gray had no interest whatever in the land. The money was wholly supplied by the defendants, although, as has been observed, they wrote that they "had Mr. Gray pay an amount to make the mortgage an even $15,000." Gray executed the notes and mortgage for the deferred payments on February 21st.

The defendants say that some time between the 22d and the 26th, the date of the remittance, Gray came to them, and expressed regret that he had made the purchase, because of other financial engagements which he was required to meet. He said that he was willing to withdraw from the transaction without making any profit whatever. Consequently, according to the defendants, they took the purchase off of his hands, but they did not advise the executors thereof. About two months afterwards they prepared and forwarded to the executors a deed of conveyance to Gray, as the purchaser. It was conceded that, aside from the notes and mortgage which he executed, Gray never had a dollar invested in the transaction; that he made nothing and lost nothing.

It also appeared that, shortly before the commencement of the action in the court below, the executors wrote the defendants, charging them with bad faith, and with purchasing the land for themselves in the name of Gray. In reply, the defendants denied the charge that Gray was not the real purchaser, and referred the executors to certain court records for proof that Gray had contested the amount of the tax, which, as purchaser, he assumed, had succeeded in reducing it, and had finally paid the reduced amount. The truth was, however, that Gray did not pay the tax. It was paid months after the time the defendants claimed to have purchased the land from him, and after Gray himself ceased to claim any interest in it. At the same time the court records in the tax proceedings would doubtless have afforded some proof of their assertion, in that Gray was recognized therein as the owner of the land; but the testimony conclusively showed that from February to May, 1902, the defendants had no writing evidencing their alleged purchase from Gray, and from May to August, 1902, a deed from Gray to them was, according to the testimony of defendant Moore, kept from the records in order to avoid making new parties to the court proceedings. The letter of defendants regarding proof by the court records that Gray had paid the tax was therefore obviously misleading. One of the executors had seen the land several years before the transactions which have been related. The other had never seen it. Both of them relied largely upon the representations of the defendants concerning it.

About the first of the year 1902, in order to prepare the records for a proper conveyance of the title, an attested copy of the will of the testatrix and a transcript of the probate proceedings in the orphans' court of Allegheny county, Pa., were filed in the probate court of Cherokee county, Iowa, and the will was admitted to probate and record in the latter county as a foreign will. The order of the Iowa court contained a confirmation of the foreign appointment of the executors, and also a clause appointing them as such in that court. There was no bond given or formal qualification by them in Iowa. One of the defenses in the answer was that the court below was without jurisdiction to hear, try, or determine the cause, but the accompanying allegations showed that defendants evidently intended to chal-

lenge the capacity of the plaintiffs to maintain the action in Iowa. At the conclusion of the trial the plaintiffs interposed a motion for a verdict. The journal of the court recites that the motion was sustained, and that the jury returned a verdict in favor of the plaintiffs for $5,207. The record does not disclose that any writing in the form of a verdict was signed by any one acting as foreman of the jury. Judgment having been entered for the amount of the verdict, the defendants prosecuted this proceeding in error.

E. H. Hubbard and A. R. Molyneux, for plaintiffs in error.

J. D. F. Smith and C. H. Lewis, for defendants in error.

Before VAN DEVANTER and HOOK, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The assignments of error present but four propositions which require consideration: Had plaintiffs, as foreign executors, authority to maintain the action in the state of Iowa? Did the Circuit Court commit error in permitting the plaintiffs to amend their petition on the eve of trial? Was the fact that no writing in the form of a verdict was signed by or on behalf of the jury fatal to the judgment? Did the Circuit Court err in directing a verdict for the plaintiffs upon the evidence adduced at the trial?

1. The will of the testatrix was duly probated in Allegheny county, Pa., and, the plaintiffs having qualified as executors, letters testamentary were there issued to them in due course. An attested copy of the will and a transcript of the probate proceedings were recorded in the county in Iowa in which the land was situated. By an order of the probate court in Iowa the same executors were appointed as such in that state, but they did not there qualify or give bond or receive letters testamentary. We will not pause to consider whether the language of the order in Iowa invested the executors with a domestic character, and whether the failure to qualify, give bond, and take out letters testamentary in that state can be urged in this proceeding. It may be assumed for the purposes of this cause that they were purely foreign executors; possessing, however, under an express provision of a statute of Iowa, the power to sell and convey the real property of the testatrix in that state. Proceeding with this assumption, did they have the right to maintain the action in Iowa for the recovery from their agents of the proceeds of a sale of land made under their authority? This question was presented by the defendants' answer, wherein it was alleged that the plaintiffs were appointed and qualified as executors only in the state of Pennsylvania, and that they had never been qualified or authorized to act as such under the laws of the state of Iowa. The general rule undoubtedly is that an executor or administrator in his representative capacity cannot maintain an action in the courts of any sovereignty other than that under whose laws he was appointed and qualified, without obtaining an ancillary grant of letters in the state where the action is brought, unless the right so to do is conferred upon him by the law of the forum. Fenwick v.

Sears' Administrators, 1 Cranch, 259, 2 L. Ed. 101; Dixon's Executors v. Ramsay's Executors, 2 Cranch, 319, 2 L. Ed. 453; Doe v. McFarland, 9 Cranch, 151, 3 L. Ed. 687; Kerr v. Moon, 9 Wheat. 565, 6 L. Ed. 161; Vaughan v. Northup, 15 Pet. 1, 5, 10 L. Ed. 639; Noonan v. Bradley, 9 Wall. 394, 19 L. Ed. 757; Johnson v. Powers, 139 U. S. 156, 11 Sup. Ct. 525, 35 L. Ed. 112. The rule as to foreign guardians is the same. Morgan v. Potter, 157 U. S. 195, 15 Sup. Ct. 590, 39 L. Ed. 670. But whenever the cause of action declared upon by the foreign executor or administrator is one which involves an assertion of his own right, rather than one of the deceased, or which has accrued directly to him through his contract or transaction, and was not originally an asset of the estate in his charge, he may maintain an action in another state for the enforcement thereof, although express authority so to do may not be found in a statute of the forum. The principle underlying this modification of the general rule is that, when the cause of action accrues directly to the executor or administrator, it is assets in his hands for which he may sue in his personal capacity, and, if he sues as executor or administrator, the words so describing him will be regarded as merely descriptive, and be rejected as surplusage. See Talmadge, Adm'r, v. Chapel, 16 Mass. 71, in which it was held that, where a judgment had been recovered in New York by an administrator appointed in that state, he could bring suit upon the judgment in Massachusetts without taking out letters of administration there. This case was approved in Biddle v. Wilkins, 1 Pet. 686, 692, 7 L. Ed. 315. See, also, Mowry v. Adams, 14 Mass. 327; Williams v. Moore, 9 Pick. 432; Kane v. Paul, 14 Pet. 33, 42, 10 L. Ed. 311. The general rule is recognized and applied in Iowa (McClure v. Bates, 12 Iowa, 77), and also the qualification which has been stated (Greasons v. Davis, 9 Iowa, 219; Chamberlain v. Wilson, 45 Iowa, 149). In Greasons v. Davis the plaintiffs, foreign executors, brought an action in Iowa upon transcripts of judgments rendered in Pennsylvania. One of the defenses was that the plaintiffs were not qualified to sue when the action was commenced. It appeared that the plaintiffs' testator recovered the judgments in Pennsylvania, and, having died, the plaintiffs, as executors, were substituted on the record, which, under the practice in that state, put them in the position of judgment creditors, as though they had been the original plaintiffs in the actions. The trial court in Iowa was requested to instruct the jury that, if the plaintiffs were not appointed and qualified as executors under the laws of Iowa at the commencement of the action, they could not recover. A refusal of the instruction was sustained by the Supreme Court of Iowa, which said:

"If they had not been made parties in Pennsylvania, they could not sue without taking out letters here. * * * Other reasons may require that they should still take out letters, in order to administer his estate here, but these reasons do not require it before suing in the present case."

The doctrine is more clearly illustrated in Chamberlain v. Wilson. Chamberlain, a citizen of Nebraska, died, holding a note executed by a resident of Iowa, and secured by mortgage upon real property in

the latter state. Letters of administration were issued in Nebraska to Van Horn, who, in his representative capacity, took possession of the note. He sent the note for collection to one Wilson, in Iowa, who collected a portion thereof from the maker, and had the money in his hands, ready to pay to the party entitled. A son of the deceased took out letters of administration in Iowa, demanded the money from Wilson, and sued him in that state upon his refusal to pay. The Nebraska administrator filed his petition as intervener, and claimed the money. It was held that, as the foreign administrator took actual possession of the note in question, embraced it in his inventory, and was charged with the principal and primary administration of the estate, he was entitled to the further control of it and its proceeds, which he did not lose by sending it to Iowa for collection. The court said:

"He may, in our opinion, maintain an action against Wilson for the proceeds of the note collected and in his possession, in his own name, without taking out new letters of administration. Probably, under the doctrine of McClure v. Bates, 12 Iowa, 77, he might not be enabled to maintain an action as administrator for the collection of the note. But the note came rightfully into his possession in virtue of the administration granted in Polk county, Nebraska. It was collected, and the proceeds were in the hands of Wilson, so that the right to maintain an action upon the note is not involved."

This doctrine is elsewhere generally recognized. In Trecothick v. Austin, 4 Mason, 16, Fed. Cas. No. 14,164, Mr. Justice Story said:

"But it is by no means clear that, if Trecothick's executors were now suing, they would be obliged in the present case to take out administration here before they could proceed. The demand against Ivers or the defendant [J. L. Austin] is not a demand which accrued in Trecothick's lifetime, or out of any contract with him. But it is a demand which accrued under agencies created by them, in their character as executors, after the death of Trecothick. They might, under such circumstances, have maintained a suit in their own names for an account against their agent, and need not have sued in their representative capacity. See Cockerill v. Kynaston, 4 Term R. 280; Cowell v. Watts, 6 East, 405; Thompson v. Stent, 1 Taunt. 322; Toll, Ex'rs, bk. 3, c. 10, p. 439. The agent would be estopped to deny their right to receive what he had collected in virtue of their authority. See Nickolson v. Knowles, 5 Madd. 47; 10 Vin. Abr. 'Estoppel,' M; 2 Comp. 11."

In Lawrence v. Lawrence, 3 Barb. Ch. (N. Y.) 71, Chancellor Walworth said:

"As a general rule, a foreign executor is not entitled to sue in our courts without having proved the will and taken out letters testamentary thereon in the proper probate court of this state. These rules, however, are only applicable to suits brought by executors for debts due to the testator, or where the foundation of the suit was based upon some transaction with the testator in his lifetime. They do not prevent a foreign executor from suing in our courts upon a contract made with himself as such executor."

To the same effect are Fox v. Tay, 89 Cal. 339, 24 Pac. 855, 26 Pac. 897, 23 Am. St. Rep. 474; State v. Kaime, 4 Mo. App. 479; Tyer v. Milling Co., 32 S. C. 598, 10 S. E. 1067; Lewis v. Adams, 70 Cal. 403, 11 Pac. 833, 59 Am. Rep. 423; Barton v. Higgins, 4 Md. 539; Rogers v. Hatch, 8 Nev. 35; Wayland v. Porterfield's Ex'r, 58 Ky. 638; Barrett v. Barrett, 8 Me. 346; Trotter v. White, 18 Miss. (10 Smedes & M.) 607; Johnston v. Wallis, 41 Hun, 420; Terrell v. Crane,

55 Tex. 81; Griswold v. Railroad Co., 9 Fed. 797, 798; Goodyear v. Hullihan, 2 Hughes, 492, Fed. Cas. No. 5,573.

In the case at bar the cause of action did not exist in the lifetime of the deceased. The proceeds of the sale sued for were never assets of her estate. The employment of defendants as agents to make the sale of the land was by the plaintiffs as executors. The right to recover the avails of any such sale accrued directly to the plaintiffs, and they were authorized to assert it in Iowa without procuring new letters in that state.

2. The allowance of the amendment of the petition was within the discretion of the trial court. The defendants did not suggest to the court that they were taken by surprise, and request additional time to meet the interpolated averment. It is claimed by them that the amendment changed the proceeding from an action at law to a suit in equity, but we are unable to concur in that view. If, as was charged, the defendants, whilst their agency subsisted, purchased for themselves the land of their principals, using the name of another for that purpose, and resold the same at a higher price, the benefit of the resale inured to the principals, and an action at law was maintainable for the profit which was received and retained.

3. Complaint is made that the trial court ignored the jury, sustained a motion for judgment, and rendered judgment thereon without the mediation of a verdict. The record, however, does not sustain this contention. The journal entry, which imports verity, recites that the plaintiffs moved the court to instruct the jury to return a verdict; that the motion was sustained by the court; that, under the instruction of the court, the jury returned a verdict; and upon that verdict the judgment was rendered. While the usual and the better practice, where the result is determined by the court as matter of law, is that a formal verdict in writing be returned by the jury, the absence thereof is not fatal to the validity of the proceedings. Cahill v. Railway, 74 Fed. 285, 20 C. C. A. 184.

4. Bearing in mind the rules that control a court in its duty to submit controverted questions of fact in an action at law to the jury, and in its duty, equally imperative, to direct a verdict when the state of the proofs requires it, we are of the opinion that the action of the Circuit Court was right. It was shown conclusively that the relation of principal and agent between the plaintiffs and the defendants did not cease with the preparation and signing of the contract of sale with Gray. The defendants had expressly agreed that, for the compensation which they were to receive, they would look after the interests of the plaintiffs until the business was concluded and the money fully paid. Moreover, the contract of sale which was signed by them as agents of the plaintiffs contained an unauthorized provision binding the latter to the execution of a warranty deed to Gray. In that condition it was unenforceable against the plaintiffs, nor did Gray at any time before the defendants took his place in the transaction so obligate himself that the plaintiffs could have held him to a purchase. The matter proceeded with the important condition respecting the character of the deed left un-

settled and undetermined by any obligatory writing signed by Gray, down to the time the notes, mortgage, and the cash payment were sent to the plaintiffs, and possibly to the time when, two months later, they struck from the proposed deed the clause of warranty, and executed and returned it to the defendants. But before either of these things were done, Gray, the grantee in the deed, had ceased to have or claim any interest whatever in the property. Before the notes and mortgage were sent to plaintiffs, and before the payment on the purchase price was made, and whilst the trust relation between the plaintiffs and defendants existed, Gray came to the latter, and expressed regret at having made the purchase, and a desire to withdraw therefrom. This was an important fact materially affecting the interests of the plaintiffs, and of which they were entitled to be fully and fairly advised by their agents. Whatever of benefit under the circumstances might accrue from the willingness of Gray to abandon his purchase or attempted purchase ought not to have been secretly reserved by the agents for their own advantage. They were bound to the utmost good faith, and to the subordination of their own interests to those of their principals. Facts then within the knowledge of the defendants evidenced at least a probability that a higher price could be secured for the land than Gray was to pay, and the defendants did pay as his successors. It will not do to draw lines too nicely to aid agents who have, during the existence of their relation of trust and confidence, assumed a position with reference to the business in their charge which is antagonistic to their principals. What we have said concerning the state of the negotiations when the defendants took the place of Gray in the purchase indicates a clear distinction between the case at bar and that of Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592, upon which reliance is placed. In that case the court said:

"The sale to O'Donohoe was so far consummated that neither party was at liberty to undo what had been done. O'Donohoe executed his notes for the deferred payments, and, his wife uniting with him, gave a mortgage to secure them. The notes and mortgage were delivered to and accepted by the plaintiff, who executed a deed to O'Donohoe, and placed it in the hands of Polk, to be delivered to O'Donohoe whenever a decree for the sale of the property was obtained, and upon the payment of the $1,000 stipulated to be paid in cash. So that, at the time Polk took the property from O'Donohoe, it was not in the power either of the plaintiff or of O'Donohoe to rescind the contract between themselves, and Polk's agency for the sale of the property had, in every material sense, terminated. Nothing then stood in the way either of O'Donohoe's agreeing that Polk should take the property, or of Polk's becoming a purchaser from him. If the sale to O'Donohoe was an actual sale, in good faith, so far as Polk had any agency in effecting it—if the contract between the plaintiff and O'Donohoe had been so far executed at the time Polk took O'Donohoe's place in the purchase that it could not be rescinded by either party to it—then Polk's agency in selling the property did not prevent him from purchasing from O'Donohoe."

The foregoing being sufficient for the disposition of this contention of the defendants, we need not determine whether, aside from the nonexistence of a binding contract of sale when the rights of Gray were taken over by the defendants, the action of the Circuit

Court was or was not justified by other features of the case. The sale finally made by the defendants at the advanced price should therefore be held to have been made by them as agents, and for the benefit of their principals.

The judgment of the Circuit Court is affirmed.