BERNSTEIN v. N. V. NEDERLANDSCHE-AMERIKAANSCHE S T O O M V A A R T-MAATSCHAPPIJ (CHEMICAL BANK & TRUST CO., Third-Party Defendant).

District Court, S. D. New York.
March 5, 1948.

See also 7 F.R.D. 63.

Bennet, House & Couts, of New York City (William S. Bennet, Victor House, Bernard A. Finkel and Seymour, Altmark, all of New York City, of counsel), for plaintiff.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Galey, of New York City, of counsel), for defendant and third-party plaintiff.

Shearman & Sterling & Wright, of New York City (John A. Wilson, MacIlburne Voorhies, and William F. Hamilton, all of New York City, of counsel), for third-party defendant.

RYAN, District Judge.

Four motions made in this action at law were presented and argued at the same hearing.

(1) Defendant, Holland-America Line, moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

(2) Third-party defendant, Chemical Bank & Trust Company, moved also under Rule 12(c) to dismiss the third-party com-

plaint of defendant and third-party plaintiff, Holland-America Line, and by that motion challenges the sufficiency of plaintiff's complaint.

After notice of these motions, plaintiff served notice of "cross-motion" in which—

(3) Plaintiff moved for leave to serve a "second amended complaint," and

(4) Plaintiff moved for permission to intervene in this action in his capacity as temporary receiver of the assets of the Red Star Linie G.m.b.H. (hereafter called Red Star Line).

This action was commenced on June 1, 1945. The original complaint contained four causes of action. The fifth cause of action was first set forth in the amended complaint which was served on August 10, 1946, after order of the court had been made permitting service of an amended complaint.

We are led at the outset to a study of this amended complaint (hereafter referred to as the complaint).

Plaintiff bases his causes of action, in substance, upon the alleged unlawful taking in the month of June, 1939, in Germany, of certain property particularly the vessels S. S. Pennland and S. S. Westernland, and all the other assets of the Red Star Line, A German limited liability company. Plaintiff alleges that he "was and still is the sole owner and entitled to the immediate possession of the entire capital shares of Red Star Linie G.m.b.H.," which shares "represented the full and exclusive ownership of said Red Star Line, and as such the plaintiff was and is solely entitled to the assets of Red Star Line in any liquidation thereof."

The complaint further alleges that plaintiff "was taken forcibly into custody by Nazi officials of Germany and imprisoned in a jail in Hamburg, Germany," and that "during the entire period of his imprisonment the plaintiff was led and had reasonable cause to believe, and did believe, that said Nazi officials had designs on his life as well as liberty and business interests." And continues that "while still so imprisoned, was compelled by said Nazi officials, by duress and unlawful threats of severe bodily harm, indefinite imprisonment and

death, as well as business ruin, to execute documents purporting to transfer and to sanction the transfer of said entire capital shares of Red Star Line to one Marius Bœger." And that "while still so imprisoned the plaintiff was told and led to believe by said Nazi officials and others and had reasonable cause to believe, and actually did believe, that he would be put to death, subjected to serious bodily injury, or imprisoned indefinitely, as well as ruined in his business, unless he executed the said documents, and he executed such documents by reason of and under such circumstances," and that the "documents, accordingly, were and are null and void and of no force and effect."

The complaint further alleges that "as a consequence of the execution of such documents and the authority purportedly conferred thereby," Marius Bœger "took possession and control of Red Star Line and undertook the liquidation and the disposition of the assets thereof, and pursuant thereto in or about June 1939 the said assets of Red Star Line * * * were transferred to and taken into possession by the defendant [Holland-America Line] illegally and without fair and adequate consideration * * * while the plaintiff was still imprisoned. * * *" And, that Holland-America Line "came into possession and control of the said assets of Red Star Line with full knowledge of plaintiff's imprisonment," and "knew or should have known that the plaintiff had been compelled by duress and unlawful threats of severe bodily harm, indefinite imprisonment and death, as well as business ruin, into executing the said documents * * *."

These allegations are repeated in all five causes of action set forth in the complaint. And, plaintiff demands judgment "for the possession of said assets of Red Star Line or for the sum of $3,300,000.00, the value thereof in case possession thereof can not be given to plaintiff, on the First, Second and Third causes of action. * * *"

In the first cause of action, plaintiff claims unlawful conversion of said assets of Red Star Line by Holland-America Line; in the second, plaintiff sues for the wrongful detention of said property; in the third, plaintiff claims failure to return

property on demand; in the fourth, plaintiff sues for $2,500,000 for the loss of the use of said assets while unlawfully detained; and in the fifth cause of action, plaintiff sues for the proceeds of two ships —the insurance on the S. S. Pennland, which was sunk in April, 1941, and the sale of the S. S. Westernland, which it is alleged Holland-America Line sold in January, 1943. Plaintiff also demands earnings, profits and benefits received by the latter from the use of said assets. In this last cause of action the amount claimed is $3,660,000.

Here, it should be noted that within a few days after this action was begun, plaintiff instituted suit in the Supreme Court of the State of New York, New York County against Van Heyghen Freres, S. A., a Belgian corporation, for damages arising from the alleged unlawful taking of another vessel belonging to a certain German limited liability company of which he alleged he was sole owner of all the shares. The action was removed to this court and upon motion, subsequently made by defendant in that case, the complaint was dismissed. On appeal to the Circuit Court of Appeals that decision was affirmed. Bernstein v. Van Heyghen Freres, S. A., 2 Cir., 163 F.2d 246. A petition filed with the United States Supreme Court for certiorari was denied. 332 U.S. 772, 68 S.Ct. 88.

Defendant submits as part of its moving papers, a copy of the complaint in that action which was brought by plaintiff as sole owner of the entire capital shares of Arnold Bernstein Schiffahrtgesellschaft m.b.H., a German limited liability company, against Van Heyghen Freres Societe Anonyme, defendant. The allegations in the Van Heyghen complaint are substantially the same as those contained in the complaint herein. Many of the material allegations are identical.

Paragraphs 2 and 3 of the instant complaint are precisely the same as paragraphs 2 and 3 of the Van Heyghen complaint, save for the names of the German companies involved. The allegations of alleged duress exercised on plaintiff in paragraphs 8, 9 and 10 are the same as the allegations in paragraphs 4, 5 and 6 of the Van Heyghen complaint. In the latter the acts of duress are ascribed to "Nazi officials *in* Germany," while in complaint herein they are ascribed to "Nazi officials *of* Germany." Paragraph 7 of the Van Heyghen complaint is the same as paragraph 11 of this complaint except for a few inconsequential changes in the wording. All the allegations of paragraph 12 in the complaint herein are contained in paragraph 8 of the Van Heyghen complaint, the only difference being that in the latter plaintiff's Jewish faith and the policy of eliminating so-called non-Aryans from the German Reich is alleged. Paragraph 9 of this latter complaint is the same as paragraph 13 of the instant complaint.

In both the first cause of action is for conversion. In the Van Heyghen complaint the second cause of action embodies the essential allegations of the second, third and fourth causes of action of the Holland-America Line Complaint. The third and fourth causes of action of the Van Heyghen complaint are essentially the same as the fifth cause of action of the complaint herein. In the former the plaintiff demands judgment for damages merely, but here plaintiff demands judgment for possession of his property as well as damages.

It was said by the Circuit Court of Appeals in Bernstein v. Van Heyghen Freres, S. A., supra, at page 248 of 163 F.2d:

"* * * there is no dispute about any of the facts except as to the meaning of the phrase, 'Nazi officials,' which recurs a number of times in the complaint and the plaintiff's supporting affidavit. Does that phrase in the context in which the plaintiff used it 'clearly indicate' that the duress under which he acted was imposed by persons who were acting, or who purported to be acting, as officials of the Third Reich? Little can be added, we think, to the cogency of the language itself. The plaintiff does not explain what else he could have meant by the phrase; who else but an accredited agent of the government would have 'imprisoned' him 'in a jail in Hamburg'; or who else would have proceeded by means of a 'Nazi designee' who later sold to the defendant."

And the court further said at, page 249 of 163 F.2d:

"We have repeatedly declared, for over a period of at least thirty years, that a court of the forum will not undertake to pass upon the validity under the municipal law of another state of the acts of officials of that state, purporting to act as such. We have held that this was a necessary corollary of decisions of the Supreme Court, and if we have been mistaken, the Supreme Court must correct it."

It is obvious therefore that when these principles of law so enunciated are applied to the complaint herein, it must be found that the district court has no power to proceed on the facts alleged, and the complaint must, as it now stands, be dismissed.

At this point, we have to consider the cross-motion of plaintiff for leave to serve a "second amended complaint," which, with this motion, he now submits. This proposed second amended complaint (hereafter referred to as the amended complaint) contains only four counts. Plaintiff does not seek judgment "for the possession of said assets of Red Star Line" or in the alternative a money judgment, as in the complaint, but merely a money judgment. In both complaints, however, he seeks judgment upon the ground that because of the coercion practiced upon him, certain documents executed by him relating to the matters in controversy are null and void; but, while in the complaint he alleged that the acts of coercion were the acts of "Nazi officials of Germany," while he was "imprisoned in a jail in Hamburg, Germany," here, while pleading that he was "under duress and coercion" there is no allegation of imprisonment by Nazi officials or by anyone else. When compared with the complaint, the amended complaint neither amplifies nor corrects any of the allegations concerning the acts of "duress and coercion"; the details alleged in the former are now simply omitted.

The complaint alleged that "in January 1937 the plaintiff was taken forcibly into custody by Nazi officials of Germany and imprisoned in a jail in Hamburg, Germany," and "that said Nazi officials had designs on his life as well as liberty and business interests" and that he "was compelled by said Nazi officials, by duress and unlawful threats of severe bodily harm, indefinite imprisonment and death, as well as business ruin," to execute the transfers involved. The amended complaint contains none of these details, nor does it set forth the circumstances or the source of the threats. It only alleges that, "Prior to November 1938 plaintiff, being then in Germany, was told and led to believe that unless he executed documents appointing one Marius Bœger to direct the management and affairs of said Red Star Line and transferring to said Marius Bœger control of plaintiff's interest in and shares of said Red Star Line, plaintiff and members of his family then in Germany would be in grave peril of life, limb and liberty, and plaintiff would be ruined financially."

We do not stop here to pass upon the legal sufficiency of these very general allegations of coercion and duress. Indeed, it appears that they are entirely insufficient, cf. Chamberlain Machine Works v. United States, 270 U.S. 347, 349, 46 S.Ct. 225, 70 L.Ed. 619; Kamenitsky v. Corcoran, 177 App.Div. 605, 164 N.Y.S. 297; possibly, this might be cured by plaintiff, if permission were to be granted for the service of an amended complaint. In one of their briefs, plaintiff's attorneys say of this proposed amended complaint:

"The proposed amendment of the complaint has for its purpose the elimination of language which may be subject to misinterpretation and misconstruction, and the inclusion of facts (such as amount of damages sustained, legal status of Red Star Line, etc.) some of which were ascertained upon the continued examination before trial of the defendant, or otherwise subsequent to the service of the amended complaint. These additional facts are complementary and germane to the allegations in the present amended complaint and could have been included therein had they then been known. The defendant will not be prejudiced if the additional allegations are included now. See Moore v. Petty, [8 Civ., 1905], 135 F. 668, 669, 675; Michelsen v. Penney [2 Civ., 1943], 135 F.2d 409, 416, 417; Downey v. Palmer, [2 Civ., 1940], 114 F.2d 116, 117; * * *."

And they say further that: "The proposed amended complaint is not based upon

acts of officials of the German government acting as such performed within German territory. The elimination of references to Nazis and Nazi officials is a complete answer to defendant's contention that the acts of which the plaintiff complains are not subject in this country to review or challenge as to their validity. The Circuit Court of appeals' decision in the Van Heyghen case stated (163 F.2d at page 249) that even if German law in 1937 authorized private extortion of Jewish owned property, no court of New York would recognize title obtained through such extortion, and accordingly the victim thereof would be permitted to reclaim his property. See also Stern v. Frisch, Sup. 1946, 66 N.Y.S.2d 497."

It is quite apparent that plaintiff by his amended complaint seeks to overcome the difficulties presented to him by the application of the decision in the Van Heyghen case, supra, to the complaint.

Rule 15(a) of the Federal Rules of Civil Procedure provides that, under the conditions here presented, plaintiff "may amend his pleading only by leave of court" and "leave shall be freely given when justice so requires." This application for permission to serve a second amended complaint comes after leave has already been granted to serve a first amended complaint (by Judge Francis G. Caffey, U.S.D.J., on July 23, 1946). More than eight years have elapsed since the events complained of occurred and two and a half years since suit was brought. Yet, plaintiff's request does not impress us as being a manoeuvre to prolong futile litigation; but rather as an effort by a litigant, who allegedly has suffered grievous wrong and damage, to secure his day in court that he may have an opportunity to present the evidence he has to support his claims.

Plaintiff, in explaining the changes now made in the proposed amended complaint, relates in the affidavit supporting his application:

"It is true that I had been arrested by persons who I assumed and still believe were members of the Nazi party. I am of the Jewish faith and then I knew what now is a matter of common knowledge, namely, what was then happening in Germany to persons of my faith. Advisers, whom I trusted, including my own then attorneys, told me that they had talked with Nazi officials, and were convinced by all the circumstances of the situation that unless I surrendered my shipping interests my own life and liberty and also the liberty and lives of the members of my family would be gravely imperiled. I believed my advisers, and solely by reason of that belief and in fear of the threatened consequences, I signed the documents purporting to transfer my properties."

"The duress under which I acted was the consequence of my knowledge of what was happening in Germany and what had happened to me, and of the statements made to me by my advisers, who were private persons and neither governmental officials nor purporting to act as such. Bœger was never represented to me to be a governmental agent, but merely as an acceptable 'trustee' to supervise the affairs of my lines in my stead."

"Furthermore, I never intended to and did not allege that the extortion of my property was a governmental confiscation or nationalization. It never entered my mind that by the use of the word 'Nazi' or the phrase 'Nazi officials,' which I used in the colloquial sense to describe individuals, I could be thought by any one to be characterizing as governmental confiscation the extortion of my property. There never was a decree, order or governmental or judicial action appropriating the properties I signed over. Information which I have received recently confirms that the Red Star Line continued uninterruptedly after my arrest, and until its liquidation, as a private enterprise, and that the German government never assumed control over its affairs nor took or received any property, moneys or benefits from it.

"Promptly after the cessation of hostilities in Europe I commenced efforts to secure from Germany confirmation of details concerning the transactions of which I was the victim. Because of post-war difficulties of communication, these efforts were not immediately fruitful. I learned authoritatively, for the first time, that the Red Star Line had been dissolved as of June 22, 1939, when I received a letter from my

342

former German attorney, Dr Carl Stumme, dated April 1, 1947 and mailed from Hamburg, Germany. Thereafter, in a letter dated July 24, 1947, also mailed from Hamburg, Germany, he sent me certified copies of extracts from the files of the Commercial Registry in Hamburg showing such dissolution. On August 28, 1947, after the expiration of my time to move in the Van Heyghen case for a rehearing in the Circuit Court of Appeals, and a few days after the filing of my petition for certiorari in that case in the Supreme Court, I received a letter from him stating that he had succeeded in communicating with Marius Bœger, and was in receipt of a letter from Mr. Bœger stating that the latter had concerned himself with the Red Star Line only in the capacity of a private individual; that he was never at any time, in any way an agent of the German government or of any of its officials; and that the Red Star Line was never a German governmental undertaking nor operated as such during his connection with it."

 Plaintiff now submits to the court, for the first time, an affidavit of Marius Bœger, sworn to on December 20, 1947, and authenticated by the American Vice-Consul at Hamburg, on January 14, 1947, in which Bœger recites:

"2. I have never been a German governmental official or agent and in particular at no time served as such during the years 1937, 1938, or 1939.

"3. * * * "Later, on October 7th 1938, on the request of the representative of the Chemical Bank of New York, Mr. Kollmar, Mr. Bernstein's shares were transferred to me as trustee, by an action before the Notary Public, Dr. Wantig of Hamburg in the office of the American Consul General at Hamburg. Thereafter in June 1939 on the request of the Chemical Bank I caused the Red Star Line to be dissolved, when the ships were sold by the said representative of the Chemical Bank to the Holland-America Line, the effective date of its dissolution being June 22nd, 1939.

"4. It is absolutely out of the question that the Red Star Line was ever a German governmental undertaking or operated as such during the period above mentioned, from early 1937 until its dissolution. I

concerned myself with the Red Star Line only in the capacity of a private individual, on the basis of the authority executed by Mr. Bernstein, never as an agent of the German Government. The operation of the company remained in the hands of its business managers. I only supervised the operations as trustee. The German government was never to my knowledge interested in or wanted at any time, the transfer to any of its agents or to itself of Mr. Bernstein's shares in the Red Star Line."

Plaintiff now alleges, in substance, that he was despoiled of his properties (not by act of governmental confiscation), that the control of the company of which he was sole shareholder was unlawfully and unjustly taken from him, that the company was possessed "lock, stock and barrel," and liquidated and no longer exists, and that some of his property—particularly two vessels were subsequently acquired and for a time operated by the defendant, Holland-America Line, to its profit. Plaintiff is not estopped by the allegations of his complaint from asserting the claims of the proposed amended complaint, for "Nobody ought to be estopped from averring the truth or asserting a just demand, unless by his acts, or word, or neglect, his now averring the truth or asserting the demand would work some wrong to some other person who has been induced to do something or to abstain from doing something by reason of what he has said or done, or omitted to say or do." Herman, Commentaries on the Law of Estoppel and Res Judicata, 1886, § 7.

We find, however, that the complaint contains the following allegation:

"3. At all times hereinafter mentioned the defendant was and still is conducting business in the State of New York; had and still has offices in the Borough of Manhattan, City, County and State and Southern District of New York, within the jurisdiction of this Court; and was and still is engaged as a carrier in foreign trade and as such authorized to do business in the State of New York."

This allegation is omitted in the proposed amended complaint. The plaintiff makes no mention of this omission and in no way seeks either to explain or justify it.

■ This suit was begun by personal service of process in this state on the defendant; it was by this claim that plaintiff acquired jurisdiction over defendant. This allegation of the complaint must go with plaintiff throughout the litigation; it must be included in the amended complaint. Leave then is granted plaintiff to serve his proposed amended complaint with the inclusion in it, however, of paragraph "3." above-quoted of the complaint.

■ We turn now to a consideration of this amended complaint and deem that the motions made by defendant and third-party defendant are addressed to it. United States ex rel. Brensilber v. Bausch & Lob Optical Co., 2 Cir., 131 F.2d 545, 547; Stephens v. Reed, 3 Cir., 121 F.2d 696, 699. Both defendant and third-party defendant argue that the claims pleaded in the plaintiff's proposed amended complaint are to recover damages for injury to property and assets of Red Star Line and are barred by the three-year statute of limitations.

■ The statute of limitations of New York, which is the statute to be applied (Warner v. Buffalo Drydock Co., 2 Cir., 67 F.2d 540), is contained in § 49, subd. 7, of the Civil Practice Act which provides:

"The following actions must be commenced within three years after the cause of action has accrued:

\* \* \* \* \* \*

"7. An action to recover damages for an injury to property, except in the case where a different period is expressly prescribed in this article."

Prior to 1936, when subdivision 7 was added to this section, the statutory period in New York in actions to recover damages for "injury to property" was 6 years, C.P.A. § 48, subd. 3, prior to 1936, except that in the case of an injury to property resulting from negligence the period was three years, C.P.A. § 49, subd. 6. The General Construction Law, Consol.Laws, c. 22, defines "injury to property":

"Sec. 25-a. Injury to property. 'Injury to property' is an actionable act, whereby the estate of another is lessened, other than a personal injury, or the breach of a contract."

And, § 48, subd. 1, of the Civil Practice Act provides:

"The following actions must be commenced within six years after the cause of action has accrued:

"1. An action upon a contract obligation or liability express or implied, except a judgment and except as provided by section forty-seven and section forty-seven-a."

In determining whether the statute bars the cause of action pleaded, we should be mindful of what was said in Bozant v. Bank of New York, 2 Cir., 156 F.2d 787, at page 789:

"In deciding that issue we must take against the defendant every question as to which there is the least doubt, for the appeal is from a summary judgment."
and, at page 790 of 156 F.2d:

"In conclusion we cannot avoid observing that the case is another mistaken effort to save time by an attempt to dispose of a complicated state of facts on motion for summary judgment. This is especially true when the plaintiff must rely for his case on what he can draw out of the defendant. Arnstein v. Porter, 2 Cir., 154 F.2d 464. It appears to be somewhat difficult to persuade the district courts of this; but we are satisfied that it is true."

We accept then only the facts pleaded in the complaint and set forth in plaintiff's affidavits.

We examine the proposed second amended complaint, deemed to have been drawn in conformity with the view herein expressed and to include the allegations of paragraph "3" of the complaint, above-quoted. In the first cause of action, described and pleaded as the "First Count," in paragraph "11," plaintiff alleges:

"Upon information and belief, thereafter and on or about June 2, 1939, the said Bœger purported to effect the transfer of said assets, having a then fair market value of approximately $3,300,000., to the defendant, which in connection therewith made a payment of approximately $700,000., no part of which was paid to the plaintiff or said Red Star Line."

And he continues in the following paragraphs:

"12. At the time of the transaction referred to in paragraph '11' hereof, defendant well knew and had notice and reasonable cause to believe and with due care and diligence could have ascertained that plaintiff individually had divested himself of control over the management and affairs of said Red Star Line and of his rights and interest therein and in its assets solely by reason of the threats, duress and coercion aforesaid, and that the said transactions were not authorized, approved or ratified by the plaintiff.

"13. The plaintiff has duly demanded of the defendant the return of all of said assets and the earnings, gains, profits and realizations accrued, obtained or procured therefrom and the defendant has refused and continues to refuse to return the same to the plaintiff who is the lawful owner thereof.

"14. Under and by virtue of the laws of Germany as well as the laws of the State of New York the transfer referred to in paragraph '11' hereof was invalid and of no force or effect.

"15. The defendant unlawfully converted the said assets to its own use.

"16. By reason of the foregoing plaintiff has sustained damages in the sum of $2,600,000."

This is clearly an action for conversion and the date of the conversion is fixed by the pleadings as "on or about June 2, 1939," on or about one day short of six years prior to the commencement of the action.

■ Conversion is an injury to property. In Jay Bee Apparent Stores, Inc. v. 563–565 Main Street Realty Corp., 130 Misc. 23, 223 N.Y.S. 537, 541, affirmed 226 App.Div. 721, 233 N.Y.S. 792, the term "injury to property" was held to include an injury to plaintiff's business, the court saying at page 27 of 130 Misc., at page 1541 of 223 N.Y.S.:

"After reading the complaint herein I have reached the conclusion that this is an action in tort based on an injury to property. The term 'an injury to property' does not necessarily mean a physical injury to tangible property, but includes any and every invasion of one's property rights by actionable wrong. General Construction Law, § 25-A; Ghiglione v. Friedman, 115 App.Div. 606, 100 N.Y.S. 1024."

Not being able to conceive of greater injury to property than to lose it, we think plaintiff suffered injury to his property when the same was lost. In Kavanaugh v. McIntyre et al., 210 N.Y. 175, page 180, 104 N.E. 135, page 136, the Court of Appeals approved the definition of "injuries to property" found in Hilliard on Torts, 3rd Ed., 464, in the following words:

"Injuries to property are in themselves of great variety; being committed with or without force, immediately or consequentially, by misfeasance or non-feasance, by direct invasion of another's possession, or by an unauthorized use of one's own property, causing damage to another. With reference to the injuries themselves they include disseisin, * * * conversion * * * and negligence."

■ The statute of limitations has not been tolled by the fact that defendant, Holland-America Line, is a foreign corporation, for the complaint alleges that during all this time defendant was engaged in business and maintained offices in New York. "For the purposes of the Statute of Limitations this defendant is not a non-resident." McConnell v. Caribbean Petroleum Co., 278 N.Y. 189, 15 N.E.2d 573, 575.

■ Plaintiff's "First Count," an action to recover damages for conversion, falls squarely within § 49, subd. 7, of the Civil Practice Act and was barred by the three-year statute of limitations when the action was commenced.

The "First Count" must be dismissed.

■ We look now at the "Second Count." After repeating paragraphs "1" through "14" of the "First Count," plaintiff only adds that:

"18. The defendant has wrongfully and unlawfully detained and deprived the plaintiff and said Red Star Line of the use of said assets since June, 1939, and continues such unlawful detention and deprivation, to plaintiff's damage in the sum of $2,500,-000."

Since this count is based on a conversion which has allegedly continued since June,

1939, it must be dismissed for the same reasons as the "First Count."

In the "Third Count," after repeating paragraphs "1" through "14," plaintiff adds that:

"20. Upon information and belief the defendant has since June 1939 from time to time received moneys for the use and benefit of the plaintiff representing earnings of the said assets or from the use thereof in an aggregate amount of $1,662,-876, more or less.
and,

"21. The defendant is by reason of the foregoing allegations of this count unjustly enriched in the said amount of $1,662,876, more or less, and defendant owes plaintiff for money had and received by the defendant and payable to the plaintiff the said amount, for which the defendant has not accounted to plaintiff or to said Red Star Line."

In this count, plaintiff seeks to recover for moneys had and received since June, 1939, representing receipts from the earnings of the allegedly converted properties or from the use of them.

To determine which statute of limitations is applicable—the three-year period of § 49, subd. 7, or the six-year period of § 48, subd. 1, of the Civil Practice Act—we must look to the substance rather than to the form of the action. The theory of examining into facts and pleadings to determine the basis or gravamen of the action is not new to our law. Hayes v. Brooklyn Heights R. R., 200 N.Y. 183, 93 N.E. 496; McFarlane v. City of Niagara Falls, 247 N.Y. 340, 160 N.E. 391, 57 A.L.R. 1. It is clear from the other allegations of the proposed amended complaint realleged as a part of that cause of action that the gravamen of the claim is recovery of damages for injury to property based upon the alleged, tortious conversion. Hastings v. Byllesby & Co., 265 App.Div. 643, 40 N.Y.S.2d 299, affirmed 293 N.Y. 404, 57 N.E.2d 733; Cooley v. Lobdell, 153 N.Y. 596, 47 N.E. 783. Such claim clearly falls within § 49, subd. 7 of the Civil Practice Act. Whenever the gravamen of the claim is for a tortious injury to property, "whether in form it be brought ex contractu or ex delicto," the cause of action does not fall within the six-year period of limitations fixed by § 48, subd. 1 of the Act, for contract actions, but is controlled by the provisions relating to tort claims and to "injury to property." Hermes v. Westchester Racing Ass'n, 213 App.Div. 147, 210 N.Y.S. 114, 115; Miller v. City of Oneida, 153 Misc. 438, 440, 275 N.Y.S. 157. As the Court of Appeals said in Brick v. Cohn-Hall-Marx Co., 276 N.Y. 259, at page 264, 11 N.E.2d 902, at page 904, 114 A.L.R. 521:

"* * * in applying the statute of limitations we look for the reality, and the essence of the action and not its mere name."

The same rule is recognized in other New York decisions. Keys v. Leopold, 241 N.Y. 189, 149 N.E. 828; Corash v. Texas Co., 264 App.Div. 292, 295, 35 N.Y.S.2d 334.

"Statutes of Limitation very generally fix one period of time as sufficient to bar an action on a contract, and a different period of time to bar an action for a tort. In case a tort is waived and suit brought in assumpsit which period applies? Of course, the intention of the legislature should control, but unfortunately the legislature usually has no intention, and the meaning of the law must be determined by the reasonable construction of the words." Corbin, Waiver of Tort-Suit in Assumpsit, 19 Yale L.J. 221-234.

Construing these provisions of the law it was held in Loughman v. Town of Pelham, 2 Cir., 126 F.2d 714, 717, 718, 719:

"* * * The receiver, * * * contends that he had a choice of remedies: he could bring an action sounding either in tort for conversion of the bonds or in assumpsit for money realized on their sale. He chose the latter and, since the cause of action for money had and received did not accrue until receipt of the money, the six year period of limitations had not expired when his suit was commenced."

* * * * * *

"In the case at bar the gist of the action is conversion, even though the form is assumpsit for money received. The plaintiff has suffered but a single wrong for which

there can be but one recovery and one satisfaction. The statute of limitations is a statute of repose. It may at times bar the assertion of a just claim, but the legislature has found that such occasional hardship is outweighed by the advantage of outlawing claims which a plaintiff has allowed to become stale. In the light of this policy as exemplified in the decisions we believe the law of New York to be that if the statute of limitations has run against an action sounding in tort for conversion, the plaintiff is also barred from bringing an action sounding in assumpsit based on a subsequent sale of the converted property. This was the holding in O'Connell v. Chicago Park District, 376 Ill. 550, 34 N.E.2d 836, 135 A.L.R. 698 as to the Illinois statute of limitations."

It has been wisely suggested that the "waiver of tort and suit in assumpsit" doctrine be abandoned altogether, especially in code states. Corbin, Waiver of Tort-Suit in Assumpsit, 19 Yale L.J. 222–245. The assumpsit suit has only a fictional basis and choice of the assumpsit form of action should not be allowed to lengthen the permissible period for suit. 43 Columbia Law Review, 412.

■■■ Were we to consider this count as an action in equity for an accounting (which it definitely is not), the law applicable would not be different.

"The mere fact that this is an action for an accounting is not determinative of this question. When a legal and an equitable remedy exists as to the same subject-matter, the latter is under the control of the same statutory bar as the former. Rundle v. Allison, 34 N.Y. 180." Keys v. Leopold, 241 N.Y. 189, 192, 193, 149 N.E. 828, 829.

The "Third Count" must also be dismissed.

Plaintiff, in the "Fourth Count," again realleges paragraphs "1" through "14" of the "First Count" and then continues:

"23. On or about April 25, 1941 the said vessel S. S. Pennland and its equipment, being then insured, was sunk and the defendant subsequently on or about November 21, 1941 received the proceeds of insurance covering the said vessel and its equipment in the amount of $1,125,000, more or less, for the use and benefit of the plaintiff.

"24. On or about January 31, 1943 the said vessel S. S. Westernland and its equipment were sold by the defendant for the sum of $1,846,800, more or less, which amount the defendant received in or about March 1943 for the use and benefit of the plaintiff.

"25. The defendant is by reason of the foregoing allegations of this count unjustly enriched in the amount by which said receipts aggregating $2,971,800, more or less, exceed the payment of $700,000, more or less, made by the defendant, and defendant owes plaintiff for money had and received by the defendant and payable to the plaintiff the amount of such excess, to wit, $2,271,800, more or less, for which the defendant has not accounted to plaintiff or to said Red Star Line."

Here, plaintiff claims damages for unjust enrichment and for money "had and received by defendant and payable to the plaintiff."

And, to sustain this count plaintiff argues:

"In other words, while the ordinary case of 'injury to property' is essentially one to recover the amount of damage sustained, this action goes further and seeks to recover additional amounts to the extent of which the defendant realized profits. It is this factor that distinguishes the action at bar from an action in conversion governed by the three-year statute of limitations, and it is this distinguishing factor which entitled plaintiff to waive the tort, if any, and sue for money had and received—a claim governed by the six-year statute of limitations."

Professor Corbin discusses this question in his article, Waiver of Tort-Suit in Assumpsit, supra, writing at page 235:

"Suppose a statute limits actions for damages for a tort to three years after the commission of the tort, and actions on contracts to six years after the accrual of the cause of action. Then if B converts A's chattel in 1900, sells it to C in 1901, and receives the price from C in 1902, how soon is A's remedy against B barred by the statute? It is clear that A could sue in tres-

pass, trover, or replevin no later than 1903. But it has been held that A could sue B in a count for goods sold, as late as 1906; and in a count for money had and received, as late as 1908. The reason has been given thus: 'Since to maintain an action for money had and received in this class of cases, the plaintiff must prove the receipt of money by the defendant as well as a wrongful conversion, his cause of action does not arise until the receipt of the proceeds of the sale; and therefore the Statute of Limitations begins to run only from that time.' Professor Keener adds a limitation to the above rule to the effect that if B should keep A's chattel until 1904 and then sell it for money, A could not sue in assumpsit for that money. This limitation has been sustained in one excellent decision, and this writer has no quarrel with it. But it is submitted that the rule which it limits is wholly incorrect, and that the decisions sustaining the rule are faulty unless they can be justified by the peculiar wording of the particular statute to be applied. A's right to sue in assumpsit should be barred at the same time as is his right to sue in a tort action."

The Circuit Court of Appeals in Loughman v. Town of Pelham, supra, adopted this view of Professor Corbin as the law of New York and held that the statute applicable is determined at the time of the original wrong and at once begins to run; that another statute does not become applicable because of a subsequent dealing with the property alleged to have been converted. In Hastings v. Byllesby & Co., supra, where the suit was in part for the cash profits received by one of the defendants in connection with the sale of certain shares of the corporation in whose behalf the suit was brought, the court said, at page 648 of 265 App.Div., at page 303 of 40 N.Y.S.2d:

"The complaint and the affidavit of plaintiff allege the sale of the 165,000 shares of 'A' stock of Standard Power by Ladenburg in 1930. But a sale at a later date would not alter the fact that any cause of action based on the wrong accrued at the time of the acquisition of the stock in 1925. The sale of the property wrongfully acquired would not create any new cause of action, but at most would change the form of relief to which the purchaser might otherwise have been entitled. Even if it did, this would be no answer to the claim that the statute of limitations had commenced to run when the alleged wrong was inflicted."

To the same effect are Cooley v. Lobdell, supra, and Peters v. Delaplaine, 40 N.Y. 362, 369.

■■■■■ Therefore, whether the "Fourth Count" is to be regarded as based on conversion or as a new cause of action in contract, the claim is barred by the statute.

The "Fourth Count" must also be dismissed.

We come now to a consideration of plaintiff's application for permission to intervene in this action in his capacity as temporary receiver of the assets of Red Star Line. Plaintiff, by ex parte order of Hon. John E. McGeehan, Justice of the Supreme Court of the State of New York, in the County of New York, was appointed on October 31, 1947, temporary receiver of the Red Star Line, in an action pending before that court, brought by the plaintiff individually against Red Star Line, defendant.

■■■■■ The Red Star Line is a "limited liability company created and organized under the laws of Germany." Since Red Star Line is a German enemy alien, any attempted transfer of title to its assets, without a federal license is void under the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., even if that transfer is attempted by operation of law through the appointment of a receiver by a New York court. This was specifically held in Markham v. Deems Taylor et al. and Henry M. Propper as Receiver of the Property and Assets in New York of A.K.M., D.C., 70 F.Supp. 202, appeal dismissed sub. nom. Clark v. Taylor, 2 Cir., 1947, 163 F.2d 940; final judgment entered dismissing receiver's claim, November 21, 1947, Coxe, J. (Civil No. 35—581), no reported opinion. The temporary receiver of the New York assets of Red Star Line, appointed by the New York Court under § 977-b, Civil Practice Act, can obtain no title to the assets of that German company by virtue of his appointment and, therefore, has no right to intervene.

Plaintiff attempts to distinguish the Markham case upon the ground that in that case the Alien Property Custodian had "vested" the assets of the alien Austrian limited liability company involved, and, moreover, that the Custodian was party-plaintiff to the action claiming the assets in controversy. Plaintiff also contends that the present litigation may be distinguished from the Markham case upon the ground that the right of such a receiver to sue "is not prohibited by the regulations freezing the transfer of assets of blocked foreign nationals," and cites in support of this contention Commission for Polish Relief v. Banca Nationala, 288 N.Y. 332, 43 N.E.2d 345. The decision in the Markham case was not, however, based upon the fact that the Alien Property Custodian had "vested" the property in controversy and was party-plaintiff claiming the same. On the contrary, the basis of that decision was the Trading with the Enemy Act, 50 U.S.C. A.Appendix, § 1 et seq., and the Executive Orders and Rulings issued pursuant thereto that:

"Any unlicensed transfer of * * * (enemy alien's funds) * * * was expressly prohibited. And this prohibition was as applicable to a transfer by judicial process as to a transfer by voluntary act." [70 F.Supp. 205.]

And, it was pointed out in the case that "if there were any doubt on that subject," it was "completely removed" by General Ruling No. 12 issued by the Secretary of the Treasury on April 21, 1942 (7 F.R. 2991), in that:

"Under this Ruling it was provided in Section (1) that any unlicensed transfer of funds, such as involved in the present action, was 'null and void'; and in Section (4) that no transfer of such funds by judicial process created a greater right than the owner of the funds could have conferred by voluntary act prior to the issuance of a license."

Consequently, the rationale of the Markham decision is not that the property there in controversy had been "vested" by the Alien Property Custodian, but rather that any purported transfer of title to such enemy alien property by the appointment of a receiver in New York was "null and void," since no license authorizing such transfer had been issued. The same thing is true here. No license has been issued authorizing the transfer of any assets of Red Star Line.

The Custodian has asserted (in Circular 31) his intention of vesting all German and Japanese property in the United States, and that he will not "grant any license authorizing the creating or acquisition through legal process of any interest in blocked German or Japanese property." The appointment of the temporary receiver by the New York court is "null and void" insofar as it attempts to transfer or vest in the temporary receiver a right to sue for alleged assets of that enemy alien corporation. Plaintiff has established no basis for intervention, either as a matter of right or by permission. Under Rule 24(a) of the Rules of Civil Procedure, intervention as of right is permitted when:

" * * * the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action * * *."

Bernstein, individually as shareholder of Red Star Line, cannot in this action represent or in any way bind Bernstein as receiver of the New York assets of the Line, by any judgment entered herein. Consequently, there is no basis for intervention as of right.

Nor, is there any ground for permissive intervention by the receiver under Rule 24(b) F.R.C.P. The receiver represents the corporation. He is entitled to intervention only if he alleges some claim on behalf of Red Star Line itself against the defendant. Nothing is alleged in the proposed second amended complaint to show that Red Star Line, as a corporate entity, has any claim against Holland-America Line on account of the transfer made to the latter on June 2, 1939. The allegations in the present complaint purport to plead a claim on behalf of the plaintiff, Bernstein, as a sole shareholder, arising in his favor because of the coercion practiced on him. Such alleged coercion would give no claim to the cor-

poration. To permit permissive intervention, even though a common question of law and fact is presented, the intervenor must present "a claim in addition to the issues of the main suit." Per Conger, J., in Kind v. Markham, D.C., 7 F.R.D. 265, 266.

We have, heretofore, determined that plaintiff's complaint, as deemed amended, must be dismissed. There is therefore no action pending wherein a receiver might intervene.

Plaintiff's application for permission to intervene as temporary receiver is denied.

Third-party defendant's motion to dismiss the third-party complaint is granted.

Settle order (one) on notice giving effect to the entire determination on all four motions.